# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

1541 E. Wright Circle, Unit N328, Anaheim, CA 92806

)
)
)
)
)
)

Case No.   2:19-MJ-05337

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2

located in the _____Central_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841(a)(1), 846, 843(b) | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Dagmawi Abebe, Postal Inspector, USPIS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and state:  Los Angeles, California

_____
*Judge's signature*

Hon. Michael R. Wilner, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Edward Han 213-894-8230

**ATTACHMENT A-2**

PREMISES TO BE SEARCHED

The premises located at 1541 E. Wright Circle, Unit N328, Anaheim, CA 92806 ("SUBJECT PREMISES #2"). SUBJECT PREMISES #2 is further described as an apartment on the third floor[7] of the Jefferson Platinum Triangle Apartments – North Building, which is located north of Wright Circle on the east side of Magnolia Park. The apartment building is brown, white and gray in color, and the unit itself is located on the third floor at the southwest corner of the apartment building. The door to the unit is green in color with the number "328" as depicted below: In addition to the residence at SUBJECT PREMISES #2, the search includes all storage units and vehicles parked in spaces assigned to SUBJECT PREMISES #2.



---

[7] The building has a total of four floors including a ground level and three additional floors on top. Unit N328 is on the floor marked "3."

**ATTACHMENT B**

**I.  ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), (distribution and possession with intent to distribute a controlled substance), 846 (conspiracy and attempt to distribute and possess with intent to distribute controlled substances), and 843(b) (unlawful use of a communication facility (including the mails) to facilitate the distribution of a controlled substance) (the "SUBJECT OFFENSES"), namely:

  a.    Any controlled substances, controlled substance analogue, or listed chemical;

  b.    Items and paraphernalia for the distributing, manufacturing, packaging, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, heat-sealing devices, vacuum-sealing devices, balloons, packaging materials, containers, sodium sulfate, and wrapping material;

  c.    Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

  d.    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks,

traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

        e.    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

        f.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

        g.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written

communications sent to or received from any of the digital devices and which relate to the above-named violations;

h.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

i.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

j.   Contents of any calendar or date book;

k.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

l.   U.S. Mail, Express Mail, Priority Mail, United Parcel Service, Federal Express, or other private shipping service's delivery confirmation slips, labels, and associated boxes (to include any packages and envelopes delivered while the search is being conducted);

m.   Any locked or unlocked containers, storage units, garages (either attached or detached), safes and safety deposit boxes inside the SUBJECT PREMISES;

n.   Any materials, documents, or records that show the identity of the person(s) controlling, occupying, possessing, residing in, or owning the SUBJECT PREMISES,

including rental agreements, leases, rent receipts, deeds, escrow documents, utility bills, and other mailed envelopes reflecting the address and addressee; and

o.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

p.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

       ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

       c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.   If the search determines that a digital device does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

    b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

    c. Any magnetic, electronic, or optical storage device capable of storing digital data;

    d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

    e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

    f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

    g. Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

  6. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.     During the execution of this search warrant, law enforcement is permitted to: (1) depress SHORTER's and CHELSEA's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of SHORTER's and CHELSEA's face with her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.   In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.     The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

## AFFIDAVIT

I, Dagmawi Abebe, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an application for a warrant to search the premises located at 1900 E Ocean Boulevard, Apartment 1804, Long Beach, CA 90802 ("SUBJECT PREMISES #1"), and 1541 E. Wright Circle, Unit N328, Anaheim, CA 92806 ("SUBJECT PREMISES #2) (collectively, the "SUBJECT PREMISES"), the person of Aderiaun SHORTER, and the person of Kevin CHELSEA, as further described in Attachment A-1 to A-4.

2.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), (distribution and possession with intent to distribute a controlled substance), 846 (conspiracy and attempt to distribute and possess with intent to distribute controlled substances), and 843(b) (unlawful use of a communication facility (including the mails) to facilitate the distribution of a controlled substance) (the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A-1 to A-4 and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does

not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR POSTAL INSPECTOR DAGMAWI ABEBE

4.    I am a United States Postal Inspector ("Postal Inspector") with the USPIS ("United States Postal Inspection Service"), and have been so employed since June 2012.  I completed a twelve-week basic inspector training course in Potomac, Maryland, which included training in the investigation of mail theft, identity theft, mail fraud, internet crimes, threats, assaults, robberies, burglaries and prohibited mailings such as drugs and child pornography.  In addition, I have received other formal and informal training from USPIS and outside agencies including: the San Francisco District Attorney's Office, the California Narcotics Officers Association, and the Drug Enforcement Administration.  I have also completed the USPIS Basic Contraband Interdiction and Investigations training and Internet Covert Operations Program trainings. During my time as a Postal Inspector, I have participated in multiple investigations into USPS-related violations of the Controlled Substances Act, and I have also discussed my investigations with other law enforcement officers. For these reasons, I am familiar with how drug traffickers use the mail to facilitate their trafficking.

5.    I am currently assigned to the USPIS Los Angeles Division, Prohibited Mail Narcotics ("PMN") Team, which is

responsible for investigating the trafficking of narcotics
through the United States Mail.  Prior to my assignment to the
PMN Team, I was assigned to a Mail Theft Team.  In this
capacity, my responsibilities included the investigation of
crimes against the USPS and crimes related to the misuse and
attack of the mail system, including theft of United States
mail, possession of stolen United States mail, access device
fraud, and identity theft.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   In late 2018, USPIS Los Angeles Division started
investigating a drug trafficking organization ("DTO") which is
believed to be sending drugs from the Southern California area
to other parts of the country using the United States mail,
while in turn, receiving drug proceeds from other states through
the United States Mail.  A review of United States Postal
Service ("USPS") business records showed the DTO utilizes many
addresses, including post office boxes.  Suspected members of
this DTO in Southern California include:

a) Aderiaun SHORTER, also known as Aderiauna SHORTER
   ("SHORTER"), who resides at SUBJECT PREMISES #1.

b) Kevin CHELSEA, also known as Patric Anthony ("CHELSEA"),
   who resides at SUBJECT PREMISES #2, and who is listed as
   agent of service of process for a limited liability company
   at SUBJECT PREMISES #2.

c) Edgar Felipe Mendoza MORENO ("MORENO").

7.   In December 2018, USPIS intercepted a parcel addressed
to "A. Shortek" at SUBJECT PREMISES #1.  The parcel contained

$60,000 in cash.  In May 2019, law enforcement in Savannah, Georgia, obtained federal search warrants for three USPS parcels mailed by a suspected member of the DTO.  A search of the parcels revealed a total of $86,520 in cash.  One of those parcels was addressed to A. Shorter at SUBJECT PREMISES #1.

8.  Also in May 2019, law enforcement in Savannah, Georgia, reviewed post office surveillance video and saw a suspected member of the DTO mailing a USPS parcel addressed to A. Shorter at SUBJECT PREMISES #1.  The appearance of the parcel was consistent with one of the parcels that contained cash.

9.  In June 2019, law enforcment in Southern California surveilled SHORTER as she picked up a USPS parcel containing $20,000 cash and took it to a business where she is the chief executive.

10.  In October 2019, law enforcement in Savannah, Georgia, executed a search warrant at the residence of two suspected members of this DTO and recovered drugs, firearms, mailing and packing supplies, ledgers, and scales.  Both suspected members were arrested on state drug charges.  On a jail call, a person believed to be SHORTER asked one of the arrestees whether there were indictments and if the other arrestee was "talking" (presumably to law enforcement).

11.  In March 2019, USPIS Charlotte Division intercepted a parcel which was found to contain approximately 2,037 gross grams of suspected cocaine.  A review of post office surveillance video showed CHELSEA mailing that parcel.  Also in March 2019, law enforcement surveilled MORENO at a post office

4

in Cerritos, CA, as he mailed one parcel and picked up another parcel.  MORENO left the post office and later went to a business in Signal Hill, CA, which lists SHORTER as an organizer.  At the business, he met with CHELSEA and the two drove separately to another post office.  The parcel MORENO mailed was found to contain approximately 2,309 gross grams of suspected cocaine.

12.  In April 2019, law enforcement surveilled a suspected member of the DTO in Savannah, Georgia, mailing a parcel at a post office.  That parcel was addressed to Patric Anthony at SUBJECT PREMISES #2.  Based on a review if USPS business records, is believed CHELSEA is using the alias "Patric Anthony."  In June 2018, CHELSEA was seen on Anaheim post office surveillance videos mailing two parcels from two different post offices on the same day to two addresses in Savannah, Georgia.

13.  Based on a review of USPS business records, SHORTER and CHELSEA appear to share access to a post office box which received at least one parcel confirmed to contain cash and other parcels suspected of containing drug proceeds.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

14.  Based on my training and experience as a Postal Inspector, my knowledge of this investigation, and my conversations with other Postal Inspectors and investigators who specialize in drug investigations, I know the following:

### A.   Case Origination

15.  In late 2018, Charlotte Division Postal Inspector Jeff Lowery contacted me regarding an investigation into a DTO

operating in many parts of the United States, including the
Southern California area.  Postal Inspector Lowery suspected
USPS parcels containing proceeds of narcotics sales were being
mailed from other states to Long Beach, California.

### B.    USPIS Seizure of $60,000

16.    On or about December 2, 2018, Postal Inspector Lowery
contacted me regarding USPS Priority Mail parcel bearing label
number 9505513953728335183960 (the "3960 PARCEL") which was in
transit from Richmond Hill, Georgia, to Long Beach, California,
and requested that the 3960 PARCEL be intercepted.  On or about
December 3, 2018, I removed the 3960 PARCEL from the mail for
further inspection and saw it had characteristics common to
parcels containing contraband.  A trained drug-detection dog
positively alerted to the 3960 PARCEL, indicating the presence
of drugs or drug-contaminated items inside the 3960 PARCEL.  The
sender address on the 3960 PARCEL was listed as "Salon Elite
Inc, 110 East 40th Street, Savannah, Ga. 31401."  The recipient
address on the 3960 PARCEL is listed as "A. Shortek, 1900 E
Ocean Blvd Apt 1804, Long Beach, Ca 90802."

17.    Postal Inspectors executed a federal search warrant,
authorized by the Hon. Jacqueline Chooljian, United States
Magistrate Judge, 2:18-MJ-03213, on the 3960 PARCEL.  In the
3960 PARCEL, Postal Inspectors found approximately $60,000 in
United States currency.

### C.    Identification of Aderiaun SHORTER

18.    Some time later, Postal Inspctors reviewed USPS
business records and learned that SHORTER was receiving mail at

SUBJECT PREMISES #1.  Postal Inspectors learned that SHORTER was also associated with 133 Linda Way, Unit D, Upland, CA 91786, per her California driver license.

### D.   Identification of Additional Addresses

19.  By reviewing USPS business records, Postal Inspectors began to identify additional parcels and addresses suspected of being used by this DTO.

20.  Around this time, Task Force Officer ("TFO") Trevon Sailor was assigned by the Drug Enforcement Administration ("DEA") to investigate this matter.

### E.   USPIS Seizure of Approximately 2,037 Gross Grams of Suspected Cocaine

21.  Charlotte Division Postal Inspector Dean Hood identified USPS Priority Mail parcel bearing label number 9505516212539067384591 (the "4591 PARCEL") as being associated with the DTO.  The parcel was addressed from Patric Anthony, P.O. Box 2501, Seal Beach, CA 90740, to Granite Quarry, North Carolina.  Postal Inspectors searched the 4591 PARCEL pursuant to a federal search warrant.  In the 4591 PARCEL, Inspectors found approximately 2,037 gross grams of suspected cocaine.

22.  Postal records showed the 4591 PARCEL was mailed from the Belmont Shore Post Office.  A review of post office surveillance video showed an individual later believed to be using the alias "Patric Anthony"[1] mailing the 4591 PARCEL.

---

[1] Law enforcement's identification of "Patric Anthony" is detailed further below.

**F.    Application to Rent P.O Box 5192 in Cerritos, CA 91703, Under the Alias "Patric Anthony"**

23.    As detailed below, Postal Inspectors identified P.O. Box 5192, Cerritos, CA 91703, as being used by this DTO.

24.    On or about March 21, 2019, I was at the Cerritos Branch Post Office and obtained a copy of the Application for Post Office Box Service, and copy of a California driver's license used to rent P.O. Box 5192, Cerritos, CA 91703.  The application listed the name "Patric Anthony" with address of 18601 Del Rio Place, Cerritos, CA 90703, and a telephone number of (562)872-4219.  The California driver's license number was listed as "C8373834."  The photocopy of the driver's license was for California driver's license number "C8373834" under the name "Patric Anthony" with date of birth January 18, 1987, with address of 4901 Balboa Boulevard, Encino, CA 91316.  A subsequent query of the National Law Enforcement Telecommunications System ("NLETS") showed that driver's license number does not come back to anyone.  A query of CLEAR[2] revealed there is no one named Patric Anthony associated with the 18601 Del Rio Place, Cerritos, CA 90703, address.

**G.    MORENO on Cerritos Post Office Surveillance Video**

25.    On or about March 25, 2019, postal records show that USPS Priority Mail parcel bearing label number 9505516322079078192038, addressed to P.O. Box 5192, Cerritos, CA 90703, was delivered at the Cerritos Branch Post Office.  A

---

[2] CLEAR is a public information database that collects personal identifying information like names, addresses, and telephone numbers.

review of post office surveillance video showed an individual (later identified as Edgar Felipe Mendoza MORENO) wearing a white polo shirt with a logo on left breast picking up the parcel.

26.  On or about March 26, 2019, postal records show that USPS Priority Mail parcel bearing label number 9505514379179081134095, addressed to P.O. Box 5192, Cerritos, CA 90703, was delivered at the Cerritos Branch Post Office.  A review of post office surveillance video showed an individual wearing a white polo shirt with a logo on left breast (later identified again as MORENO) picking up the parcel.

**H.   MORENO Mailing of 6711 PARCEL and Picking Up 2987 PARCEL**

27.  On or about March 27, 2019, I was inside the Cerritos Branch Post Office conducting surveillance for this investigation in relation to an inbound USPS Priority Mail parcel bearing label number 9505514151979084272987 (the "2987 PARCEL") when I saw MORENO mailing USPS Priority Mail parcel bearing label number 9505512858229086206711 (the "6711 PARCEL").

28.  After mailing the 6711 PARCEL, MORENO picked up the 2987 PARCEL from the post office and left.

**I.   DEA Surveillance of 2987 PARCEL**

29.  That same day, DEA TFO Sailor and his team were conducting surveillance outside the Cerritos Branch Post Office and followed MORENO as he drove away in a white van with the 2987 PARCEL.

30.   The DEA team followed MORENO to 5046 La Jara Court, Lakewood, CA, 90712, where he took the 2987 PARCEL inside. MORENO left that address and drove the white van to 2700 Rose Avenue, Signal Hill, CA 90755.  MORENO exited the van and entered "Suite T" of 2700 Rose Avenue carrying a black backpack.

31.   The DEA team saw a white Lexus bearing California license plate of "8AEG375" drive into the parking lot of 2700 Rose Avenue, Signal Hill, CA 90755.  The driver resembled "Patric Anthony" – the individual in the photograph of the California driver's license attached to the application to rent P.O. Box 5192, Cerritos, CA 90703.

32.   The DEA team saw "Patric Anthony" enter Suite T. Later, "Patric Anthony" and MORENO exited Suite T and "Patric Anthony" entered the driver seat of a black Ford F150 while MORENO entered the driver seat of the white Lexus.  Both vehicles then drove out of the parking lot.  The DEA team saw both vehicles parked in the parking lot of the post office located at 2929 Westminster Boulevard, Seal Beach, CA 90740. "Patric Anthony" entered the post office and returned a short time later carrying what appeared to be a white envelope. "Patric Anthony" then reentered the black Ford F150, which had a Georgia license plate of "CEP4898."  Both vehicles left the parking lot simultaneously and drove in opposite directions. Later, the DEA team observed MORENO park the Lexus in the parking lot of 2700 Rose Avenue, Signal Hill, CA 90755, and enter Suite T.

33.   DEA TFO Sailor learned 2700 Rose Avenue Suite T, Signal Hill, CA 90755, is the business address for Leon Imported Leathers.  A query of the website for the Secretary of State for the State of Georgia using the business name "Leon Imported Leathers" return an articles of organization for "Leon Imported Leathers LLC" with address of 2090 Dunwoody Club Dr, Suite 10639, Atlanta, Georgia, and with Anthony Shorter listed as the registered agent, and SHORTER listed as an "organizer."

34.   DEA TFO Sailor also learned the white 2017 Lexus GX 460, bearing California license plate "8AEG375," driven by both Patric Anthony and MORENO, was registered to Aderiauna SHORTER, 133 Linda Way, Upland, CA 91786.

**J.   USPIS Seizure of Approximately 2,309 Gross Grams of Suspected Cocaine**

35.   Meanwhile, still on/about March 27, 2019, I inspected the 6711 PARCEL, which was mailed by MORENO and saw it had characteristics common to parcels containing contraband.

36.   The sender address on the 6711 PARCEL is listed as "Patric Anthony, PO Box – 6125, Long Beach, Ca 90806."  In CLEAR, I did not find anyone by that name associated with that address.  I obtained a copy of the Application for Post Office Box Service for P.O. Box 6125, Long Beach, CA 90806.  The post office box was opened in the name of "Patric Anthony" with a driver's license number of "C8373834."  A query of NLETS, using California driver's license number of "C8373834" did not return any records.

37.   A trained drug-detection dog positively alerted to the 6711 PARCEL, indicating the presence of drugs or drug-contaminated items inside the 6711 PARCEL.

38.   Postal Inspectors executed a search warrant for the 6711 PARCEL authorized by the Honorable Alicia G. Rosenberg, United States Magistrate Judge, 2:19-MJ-1306.  In the 6711 PARCEL, Inspectors found approximately 2,309 gross grams of suspected cocaine.

### K.   Savannah, Georgia Investigation

39.   Investigators in Savannah, Georgia, have also been investigating members of the DTO suspected of distributing cocaine in Georgia.  Investigators learned of several addresses in Savannah, Georgia, which were suspected of being used to traffic narcotics through the United States Mail.  Two of those addresses were 1699 Chatham Parkway, Apt 1306B, Savannah, GA 31405, and 9968 Bond Avenue, Savannah, GA 31406.  Using USPS and law enforcement databases, investigators identified Lisa WILLIAMS ("WILLIAMS") as a tenant of 1699 Chatham Parkway, Apt 1306B, Savannah, GA 31405.  They also found a Carlton ANDERSON ("ANDERSON") Jr. associated with 9968 Bond Avenue, Savannah, GA 31406.

40.   Investigators identified WILLIAMS picking up a suspected narcotics parcel from a P.O. Box, which according to postal records, was rented by WILLIAMS under a business name.

41.   Investigators identified several USPS parcels suspected of containing narcotics or narcotics proceeds which they believe were mailed or received by WILLIAMS and ANDERSON.

**L.    USPIS Identification of 9323 PARCEL**

42.   On or about April 15, 2019, Inspector Thomas Plumley saw WILLIAMS at a Savannah, Georgia, post office mailing a parcel later identified as USPS Priority Mail parcel bearing label number 9505510717239105309323 (the "9323 PARCEL").

43.   According to Inspector Plumley, the recipient address on the 9323 PARCEL was listed as Patric Anthony, at SUBJECT PREMISES #2.

**M.    USPIS Search of 5968, 2676, and 6268 PARCELS**

44.   On or about May 8, 2019, Postal Inspector Thomas Plumley obtained three federal search warrants for USPS Priority Mail parcels bearing label numbers 9505510717239127315968 (the "5968 PARCEL"), 9505510407839127302676 (the "2676 PARCEL"), and 9505511461329127416268(the "6268 PARCEL"), mailed by WILLIAMS on May 7, 2019.  A subsequent search of the parcels revealed a total of $86,520 in United States currency secreted in the parcels.  The parcels were resealed and returned to the mailstream on May 9, 2019.

**N.    "Patric Anthony" and Aderiaun SHORTER Picking Up Parcels Addressed to P.O. Box 14838, Long Beach, CA 90853**

45.   I reviewed a copy of the Application for Post Office Box Service for P.O. Box 14838, Long Beach, CA 90853, and learned it was rented by Terry James, 1750 E Ocean Boulevard #701, Long Beach, CA 90802, with a driver's license or state ID card number of "C2827821."  A query of NLETS using California driver's license or identification card number of "C2827821"

13

returned a California driver's license for Ronald Dean Wade of Rialto, California.

46.   Postal records showed, on or about April 25, 2019, USPS Priority Mail parcel bearing label number 9505510407839112299073, addressed to P.O. Box 14838, Long Beach, CA 90853, was delivered at the Belmont Shore Post Office.  A review of post office surveillance showed an individual who appeared to be SHORTER picking up the parcel.

47.   Postal records showed, on or about May 10, 2019, USPS Priority Mail parcel bearing label number 9505510407839127302676, addressed to Terry James, P.O. Box 14838, Long Beach, CA 90853, was delivered at the Belmont Shore Post Office.  A review of post office surveillance video showed an individual who appeared to be "Patric Anthony" picking up the parcel.

48.   Postal records showed, on or about May 23, 2019, USPS Priority Mail parcel bearing label number 9505511461349140371153, addressed to Terry James, P.O. Box 14838, Long Beach, California 90853, was delivered at the Belmont Shore Post Office.  A review of post office surveillance showed an individual who appeared to be SHORTER picking up the parcel.

**O.   USPIS Identification of PARCEL addressed to SHORTER**

49.   On or about May 13, 2019, Postal Inspector Thomas Plumley reviewed post office surveillance video and saw WILLIAMS mailing a USPS Priority Mail parcel and was able to locate that parcel which was addressed to A. Shorter at SUBJECT PREMISES #1.

Inspector Plumley noted the appearance of the parcel was consistent with one of the parcels that contained United States currency that was searched on May 8, 2019.

**P.    "Patric Anthony" Mailing Parcels to Savannah, Georgia**

50.   On or about June 12, 2019, I reviewed surveillance video from Holiday Station Post Office in Anaheim, CA, in relation to the mailing of USPS Priority Mail parcel bearing label number 9505514144119162276142.  The parcel was addressed from James Whitley, 1921 Union Street, Anaheim, CA 92805, and was being mailed to Savannah, Georgia.  Surveillance video showed an individual who appeared to be "Patric Anthony" mailing the parcel.

51.   Also on or about June 12, 2019, I reviewed surveillance video from Sunkist Station Post Office in Anaheim, CA, in relation to the mailing of USPS Priority Mail parcel bearing label number 9505513814769162154596.  The parcel was addressed from Mike Williams, 8604 E White Water, Anaheim, CA 92808, and was being mailed to Cindy Williams, 1699 Chatham Parkway Apt 1306B, Savannah, GA 31405.  Surveillance video showed an individual who appeared to be "Patric Anthony" mailing the parcel.

**Q.    USPIS Search of PARCEL Containing $20,000**

52.   On or about June 25, 2019, Postal Inspector Thomas Plumley in Savannah, Georgia, identified USPS Priority Mail bearing label number 9505510717219176479941 (the "9941 PARCEL") as being associated with this DTO.  Inspector Plumley also retrieved surveillance video of the mailing of the 9941 PARCEL

15

from the post office and saw Carlton Anderson, a known member of the DTO, mailing the 9941 PARCEL.

53.   Postal Inspectors executed a search warrant for the 9941 PARCEL and found approximately $20,000 in United States currency.

54.   The parcel was subsequently mailed to Southern California where I reintroduced it to the mailstream at the Belmont Shore Post Office.

### R.   LAPD Surveillance of 9941 PARCEL Containing $20,000

55.   On or about June 28, 2019, Los Angeles Police Department personnel assisting with this investigation were conducting surveillance at the Belmont Shore Post Office located at 5050 E. 2nd Street, Long Beach, CA 90803, for the 9941 PARCEL. The LAPD team saw SHORTER pick up the 9941 PARCEL and followed her to 1325 Palmetto Street, Los Angeles, CA 90013[3], where she took the 9941 PARCEL inside.  That address is associated with "A Modern Life" furniture store.

56.   A query of the website for the Secretary of State for the State of California using the business name "Amodernlife" return an articles of incorporation for "Amodernlife Design Inc" listing SHORTER, 133 Linda Way Unit D, Upland, CA 91786, as the agent for service.  A subsequent filing showed SHORTER as chief executive officer and the business address as 1325 Palmetto

---

[3] The LAPD surveillance report stated the team followed SHORTER to "1317 Palmetto St, 'A Modern Life' furniture store." On December 6, 2019, I spoke to LAPD Detective Guillermo Avila who reviewed the surveillance report and images of the 1300 block of Palmetto Street and made the correction that SHORTER went into 1325 Palmetto Street and not 1317 Palmetto Street.

Street, Ste 100, Los Angeles, CA 90013, and a mailing address of
SUBJECT PREMISES #1.

**S.   USPIS Seizure of $35,020**

57.   On or about August 12, 2019, I was contacted by the
Cerritos Branch Post Office regarding Priority Mail parcel
bearing label number 9505513240619221257359 (the "7359 PARCEL"),
which was awaiting delivery for P.O. Box 5062, Cerritos, CA
90703.  According to the post office, the P.O. Box was closed as
of August 11, 2019, for non-payment of rent.  I instructed the
post office to forward the 7359 PARCEL to the USPIS Alameda
Domicile.

58.   On or about August 19, 2019, I received the 7359
PARCEL and inspected it.  I observed it had characteristics
common to parcels containing contraband, including:

a.   The sender address on the 7359 PARCEL is listed
as "KEVIN BARNES, 2007 W. OXFORD ST., PHILA, PA. 19121."  In
CLEAR, I did not find anyone by that name associated with that
address.

b.   The recipient address on the 7359 PARCEL is
listed as "ANTHONY HAMPTON, P.O. BOX 5062, CERRITOS, CA. 90703."
I reviewed a copy of the Application for Post Office Box Service
for P.O. Box 5062 and learned it was rented by Anthony Hampton,
17513 Leslie Ave, Cerritos, CA 90703, with a driver's license or
state non-driver's ID card number of "E7676711."  A query of
NLETS using California driver's license or identification card
number of "E7676711" resulted in no records found.  In CLEAR, I

did not find anyone by that name associated with the address of 17513 Leslie Ave, Cerritos, CA 90703.

59.   A trained drug-detection dog positively alerted to the 7359 PARCEL, indicating the presence of drugs or drug-contaminated items inside the 7359 PARCEL.

60.   Postal Inspectors executed a federal search warrant for the 7359 PARCEL authorized by the Honorable Alka Sagar, United States Magistrate Judge, 2:19-MJ-03610.   In the 7359 PARCEL, Inspectors found approximately $35,020 in United States currency.

**T.   Execution of Residential Search Warrant in Savannah, Georgia**

61.   On or about October 11, 2019, Investigators in Savannah, Georgia, executed a search warrant at WILLIAMS and ANDERSON's residence located at 1699 Chatham Parkway, Apt. 1306B, Savannah, GA 31405, as well as a detached garage. Investigators recovered approximately 20 pounds of suspected marijuana, approximately 4.5 kilograms of suspected cocaine, 987 grams of Fentanyl, four firearms, mailing and packing supplies, ledgers, and scales.   Both WILLIAMS and ANDERSON were arrested on state narcotics charges.

**U.   ANDERSON Jail Call to SHORTER**

62.   On or about October 15, 2019, I received a recording of a jail call from Postal Inspector Plumley.   The call was made on or about October 11, 2019, and it is believed to be between Carlton ANDERSON and Rhonda Anderson, his mother.   It later turned into a three-way call between Carlton ANDERSON, Rhonda

Anderson, and SHORTER.  The person believed to be SHORTER asked,
"What happened today?"  "Was this for everywhere or just there?"
"For how long... do you know how long?"  "Is there indictments?"
"How do you know it was for months?"  When the male voice
believed to be ANDERSON said, "I got nothing to tell them."
SHORTER asked, "The other person as well?"

### V.   USPIS Seizure of 2,090 Grams of Suspected Cocaine

63.   On or about October 25, 2019, I reviewed USPS business
records and located information on USPS Priority Mail parcel
bearing label number 9505513822789297261623 (the "1623 PARCEL"),
which was en route from Long Beach, CA, to Cleveland, OH.

64.   The sender address on the 1623 PARCEL was listed as
"Anthony Hampton, PO Box – 91341, Long Beach Ca, 90809."

65.   A Postal Inspector in Cleveland, OH, seized the 1623
PARCEL and searched it pursuant to a search warrant.  Inside the
1623 PARCEL, the Inspector found approximately 2,090 grams of
suspected cocaine.

66.   I later reviewed surveillance video related to the
mailing of the 1623 PARCEL.  The video showed MORENO mail the
1623 PARCEL.

67.   I reviewed a copy of the Application for Post Office
Box Service for P.O. Box 91341.  The application listed the name
"Anthony Hampton" with address of 17513 Leslie Ave, Cerritos, CA
90703.  The California driver's license number was listed as
"E7676711."  A query of NLETS using California driver's license
or identification card number of "E7676711" resulted in no
records found.  It is worth noting this is the same name,

address and driver's license number used to rent P.O. BOX 5062
in Cerritos, California.

68.   The photocopy of the driver's license was for
California driver's license number C8373834 under the name
"Patric Anthony" with date of birth January 18, 1987, with
address of 4901 Balboa Boulevard, Encino, CA 91316.   A
subsequent query of the National Law Enforcement
Telecommunications System ("NLETS") showed that driver's license
number does not come back to anyone.   Per CLEAR[4], there is no one
named Patric Anthony associated with the 18601 Del Rio Place,
Cerritos, CA 90703, address.

**W.   Identification of "Patric Anthony"**

69.   Previously on or about April 15, 2019, Inspector
Plumley identified the 9323 PARCEL as being associated with this
DTO.   According to Inspector Plumley, the recipient address on
the 9323 PARCEL was listed as Patric Anthony, SUBJECT PREMISES
#2.   In CLEAR, I found a Patric Anthony, date of birth of
January 18, 1982, and social security number ending in 2373,
associated with the address of SUBJECT PREMISES #2.   A query of
NLETS and the California Department of Justice Cal-Photo
database did not return any records matching that name and date
of birth.

70.   Per CLEAR, CHELSEA, date of birth June 25, 1982, is
also associated with SUBJECT PREMISES #2.   A query of the
Department of Justice Cal-Photo database returned a record for a

---

[4] CLEAR is a public information database that collects
personal identifying information like names, addresses, and
telephone numbers.

California Department of Motor Vehicles driver's license under the name Kevin Kenneth CHELSEA, date of birth June 25, 1982, with address of 1350 Balboa Street, Ontario, CA 91764.  In Cal-Photo, I also located one booking mugshot for CHELSEA.

71.  I compared both photos to the photo on the fraudulent driver license for "Patric Anthony" and determined there was a very close resemblance.  Additionally, the address on the fraudulent driver license is 4901 Balboa Boulevard, Ontario, CA 91316.  In CLEAR, Kevin CHELSEA is associated with an address of 1350 N Balboa Avenue, Ontario, CA 91764.

72.  I compared both photos to surveillance videos obtained from Southern California area post offices of "Patric Anthony." I determined the person in the driver's license and mugshot photos closely resembled the person in the post office videos and stills.

73.  A query of the National Crime Information Center ("NCIC") returned a 2013 conviction for CHELSEA for a felony violation of California Penal Code section 487(D)(1), which is grand theft auto.  The other counts of "forgery" and "possession of driver's license/ID to commit forgery" were dismissed.

**X.   CHELSEA Businesses**

74.  A query of the website for the Secretary of State for the State of Georgia revealed a business named "Brite Mindz Associates LLC" with CHELSEA, 2090 Dunwoody Club Drive, Suite 10639, Atlanta, GA, 30350, listed as organizer and registered agent.

75.   The query also revealed another business named "Kevin CHELSEA LLC" with CHELSEA, 2090 Dunwoody Club Drive, Atlanta, GA, 30350, listed as organizer and registered agent.

76.   Per the Secretary of State for the State of Georgia, the articles of organization for "Leon Imported Leathers" also lists an address of 2090 Dunwoody Club Dr, Suite 10639, Atlanta, GA.

77.   A query of the website for the Secretary of State for the State of California also revealed a business named "Got Beatz LLC" with CHELSEA listed as agent of service of process, with SUBJECT PREMISES #2 as the address.

78.   On December 6, 2019, a review of USPS business records revealed both CHELSEA and "Patric Anthony" are receiving mail at SUBJECT PREMISES #2.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

79.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices, and in their homes, cars, garages, and storage units.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones or other digital devices, of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often use vehicles to transport their drugs and may keep stashes of drugs in their vehicles in the event of an unexpected opportunity to sell drugs arises.

e.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

23

     f.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, garage, car, and storage units, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

     g.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, and at their homes, cars, garages, and storage units.

     h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[5]

80. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

81. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    a.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    b.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    82.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

26

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

83.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.   Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.   I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SHORTER and CHELSEA's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of SHORTER and CHELSEA's face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

84.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

85.   Based on the facts set forth herein, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of the Subject Offenses, as described in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES and the persons of SHORTER and CHELSEA, as further

described in Attachments A-1 through A-4, respectively, of this affidavit.

_____
DAGMAWI ABEBE, United States
Postal Inspector
United States Postal
Inspection Service

Subscribed to and sworn before me
this __ day of December, 2019.

_____
HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE